**Raesheeda BALL, Appellant,**

v.

**ARTHUR WINN GENERAL PARTNERSHIP/SOUTHERN HILLS APARTMENTS, Appellee.**

**No. 05–CV–259.**

District of Columbia Court of Appeals.

Argued March 16, 2006.

Decided July 20, 2006.

Julie H. Becker, The Legal Aid Society of the District of Columbia, with whom Barbara McDowell, and Jennifer L. Berger, Legal Aid Society, were on the brief and supplemental brief, and with whom David Reiser, Washington, DC, was on the supplemental brief, for appellant.

Phillip L. Felts, Bethesda, MD, for appellee.

Before FARRELL, RUIZ, and FISHER, Associate Judges.

FARRELL, Associate Judge:

Appellant Raesheeda Ball challenges a judgment of possession entered upon a jury finding in favor of appellee Arthur Winn General Partnership/Southern Hills Apartments (hereafter "the landlord"). The jury found that Ms. Ball's rental apartment unit had been used as a "drug haven" such that she could be evicted under the Residential Drug–Related Evictions Act (the RDEA or the Act), D.C.Code §§ 42–3601 to –3610 (2001).

The RDEA permits a landlord to recover possession of a rental unit by proving that it "is a drug haven," *id.* § 42–3602(a), defined as "a housing accommodation, or land appurtenant to or common areas of a housing accommodation where drugs are illegally stored, manufactured, used, or distributed." *Id.* § 42–3601(8). The Act further instructs, *id.* § 42–3602(a), that "[i]n making the determination that the rental unit is a drug haven ... the Court shall consider," *inter alia:*

(1) Whether *a tenant or occupant* of the rental unit has been charged with a violation of the Uniform Controlled Substances Act or the Controlled Substances Act due to activities that occurred within the housing accommodation that contains the rental unit ...; [or]

\* \* \* \*

(4) The testimony of a witness concerning the possession, manufacture, storage, distribution, use, or the attempted possession, manufacture, storage, distribution, or use of an illegal drug by *a tenant or occupant* in the housing accommodation that contains the rental unit. (Emphases added.)

If the court determines by a preponderance of the evidence "that the rental unit is a drug haven," the court must order relief that may include "[e]viction of the *tenant or occupant* within 72 hours." Section 42–3604(a)(1)(A) (emphasis added).

Appellant makes two primary arguments on appeal. First, she contends that the trial judge incorrectly ruled as a matter of law—and therefore instructed the jury—that an "occupant" under the Act means *anyone* "authorized by the tenant

or housing provider to be on the premises of the rental unit," *id.* § 42–3601(16), rather than only an invitee who "lives on the premises" and is not a "mere guest[ ] or visitor[ ]" (Br. for App. at 18). Applying the plain language of the statutory definition of "occupant,"[1] we reject this argument. Ball's second contention has more merit. She contends that, in light of this court's intervening decision in *Crescent Properties v. Inabinet,* 897 A.2d 782 (D.C. 2006), the trial judge erroneously failed to instruct the jury that, to support eviction, it must find that the property "currently remained a drug haven ... at the time of the hearing," *id.* at 789—that, in the statutory words, it was a property "where drugs *are* illegally stored, manufactured, used, or distributed" at the present time. *Id.* at 786–87 (emphasis added) (quoting D.C.Code § 42–3601(8)). We agree that the judge's instructions did not focus the jury, in accordance with *Crescent Properties,* on the landlord's burden to prove that any drug activity for which Ball was responsible continued at the time of trial, *i.e.,* either was ongoing or would reasonably be expected to resume. *Id.* at 787, 789. We accordingly must remand for a new trial.

## I.

Trial of this matter took place on March 21, 2005. According to testimony presented there, on January 15, 2004, police officers answered a report of gunfire in front of the building where Ms. Ball's rental unit was located. A witness told the responding officers that the person discharging the gun had then gone into Ball's apartment. The police entered the apartment and saw five adult males, Ball's nineteen year old sister, and Ball's seven month old child there. After securing the scene, the police obtained and executed a search warrant and found in the apartment five handguns, three rifles (including shotguns), 125 grams of crack cocaine, and quantities of PCP and marijuana. They also recovered drug paraphernalia that included empty ziploc bags, plates with drug residue, a digital scale used to weigh narcotics, and $4,156 in cash. The three rifles were found in a front hall closet, and a nine millimeter semiautomatic handgun was in the same or a different hall closet. The bulk of the drugs were in a toilet (an effort had apparently been made to flush them down) and in coats lying in the common area, while the paraphernalia was found in bedrooms and the kitchen. All five men were arrested and charged with violation of the drug laws, though none was ultimately prosecuted (according to a police witness) because of concerns about the legality of the initial entry of the unit. Ball was not in the apartment at the time of the search and arrests.

On the basis of these events, the landlord served Ball with a notice to quit the apartment, asserting that she had violated an obligation of tenancy by allowing her apartment "to be used as a drug haven as defined by the [RDEA]." The landlord subsequently filed a complaint for possession against Ball alleging, among other things, the RDEA violation. Before trial, Ball objected to the admission of evidence regarding the actions of those present in the apartment when the drugs were found, asserting that because they were not residents and because visitors or guests are not "occupants" within the meaning of the Act, their actions could not establish the existence of a drug haven. Implicit in the argument was the concession—borne out by the trial testimony—that Ball would present no evidence that the others pres-

---

1. Section 42–3601(16) defines an "occupant" as "a person authorized by the tenant or housing provider to be on the premises of the rental unit."

ent had unlawfully entered the apartment or done so without her permission. Instead, Ball acknowledged at trial that Siddiq Anderson, one of the men present, was there at her request: she had asked him to stay there with her nineteen year old sister to watch Ball's child while she went out.

Relying on the statutory definition of "occupant," the trial judge rejected Ball's attempt to limit the meaning of the term to persons residing in the premises rather than those merely visiting, and left to the jury the issue of whether Anderson had been "authorized" by Ball "to be on the premises of the rental unit." The judge further instructed on the various factors to be considered in deciding whether Ball "or an occupant, a person she had authorized to be there, [had] used the premises as a drug haven." Finally, assuming the jury were to find that the landlord had met its burden on these issues, the judge instructed on the affirmative defenses Ball had raised under § 42–3604(c), each of which she was required to prove by a preponderance of the evidence. The jury rejected those defenses and found that the apartment had been used as a drug haven. The judge accordingly entered a judgment of possession for the landlord, which was stayed pending this appeal.

## II.

■ Ball concedes on appeal that under a "plausible reading[ ]" of the statutory definition of "occupant" (Br. for App. at 16), Siddiq Anderson was an occupant of her rental unit for purposes of determining whether illegal drugs were being used or distributed (or attempted to be used or distributed) "by a tenant or occupant" in

the housing accommodation, thus making it a drug haven. *See* § 42–3602(a)(4). In our view, that reading is not only plausible, it is compelled.

D.C.Code § 42–3601(19) defines a "tenant" as "a lessee, sublessee, or other person entitled to the possession or occupancy of a rental unit." By contrast, as we have noted, an "occupant" is "a person authorized by the tenant or housing provider to be on the premises of the rental unit." Section 42–3601(16). Thus, to be an occupant under the RDEA a person need only "be" on the premises with the permission ("authoriz[ation]") of the tenant or housing provider. Nothing in the definition requires the occupant to have been there for any length of time, much less to reside there or inhabit the unit under any form of sub-tenancy. In ordinary usage, a guest or invitee includes one present on premises by consent or invitation of the owner;[2] thus, the statutory definition of occupant—focusing as it does on tenant "authoriz[ation]"—reveals the unambiguous intent of the legislature to treat interchangeably the actions of tenants and their invitees or guests for purposes of whether a drug haven exists in the rental unit. And the Act as a whole reinforces this understanding by pairing the terms "tenant or occupant" in nearly all of its operative provisions. *See Cook v. Edgewood Mgmt. Corp.*, 825 A.2d 939, 952 n. 10 (D.C.2003) (observing that "the breadth of the RDEA"—including the definition of occupant—"indicates that tenants are responsible for the conduct of those in their apartments" by permission).

Ball nevertheless argues that "occupant" must be "understood against the backdrop of established landlord-tenant law," under

---

2.  *See, e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002 ed.) (defining "invitee" as an "invited person" or "guest": "a person … present in a place by the express or implied invitation of the occupier in control of that place"; defining "guest" as "a person to whom hospitality … is extended").

which "tenant" denotes "a particular contractual relationship with the landlord," in contrast to an "occupant" who is "commonly understood" to be "one who *lives* in a housing unit but has no legal right to possession." The "established" meaning of a word must yield, however, when the legislature has defined it differently. "When a legislature defines the language it uses, its definition is binding upon the court even though the definition does not coincide with the ordinary meaning of the words." *District of Columbia v. Jerry M.,* 717 A.2d 866, 871 (D.C.1998) (quoting 1A NORMAN J. SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 20.08, at 90 (5th ed. 1993)). The RDEA was enacted by the Council of the District of Columbia (in Ball's words) "to provide a streamlined process for targeting the illegal drug trade in the District's housing accommodations" by " 'giv[ing] the persons most affected by drug activity in a tenant's rental unit ... the legal authority ... to remove dangerous individuals from their communities.' " (Br. for App. at 14) (quoting COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON CONSUMER AND REGULATORY AFFAIRS, COMMITTEE REPORT ON BILL NO. 8–194, THE RESIDENTIAL DRUG-RELATED EVICTIONS ACT OF 1990, AMENDMENT IN THE NATURE OF A SUBSTITUTE, at 2 (January 24, 1990)); *see also Cook,* 825 A.2d at 945. Given this purpose, it is scarcely surprising that the Council would enlarge beyond traditional landlord and tenant categories the class of persons whose activities may create drug havens. In that regard, the Act mirrors the federal ("one-strike") eviction statute governing public housing, 42 U.S.C. § 1437d (*l*)(6), which authorizes eviction of a tenant for the criminal activity of the "tenant, any member of the tenant's household, or any guest or other person under the tenant's control." *See generally Dep't of Hous. & Urban Dev. v. Rucker,* 535 U.S. 125, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002); *Scar-*

*borough v. Winn Residential L.L.P.,* 890 A.2d 249 (D.C.2006). Ball's effort to read significance into Congress's express use of the term "guest," in contrast to the Council's use of the phrase "person authorized ... to be on the premises," is unavailing.

Ball refers to other provisions of the Act that, in her view, make a literal reading of the definition of "occupant" unreasonable. She asserts, for example, that the statute's basic provision for eviction "would make little sense" or be "an illogical use of the court's eviction process" if applied to visitors or temporary guests. Yet, of course, nothing in the Act's definition *precludes* application of "occupant" to one—such as a boarder or roommate—whom the tenant has allowed to stay in the unit on a more continuing basis than a visitor. Invoking the eviction (and notice of intent to evict) provisions directly against such occupants may be perfectly sensible. But what we reject is Ball's argument that *only* authorized presence amounting to residence is within the Act's definition, something the language that the Council chose simply does not support.

Ball further argues that giving the definition of occupant its plain meaning would produce an "absurd result" by making a rental unit a drug haven if even a one-time visitor such as a plumber or repairman—a visitor, moreover, whose presence the landlord and not the tenant may have authorized—is found in possession of drugs in the tenant's apartment. But, to begin with, it is not at all apparent that a landlord could meet its burden to prove that the rental unit "currently remained a drug haven ... at the time of the hearing," *Crescent Properties,* 897 A.2d at 789, based solely on an isolated visit by a stranger such as Ball hypothesizes. Similarly, the affirmative defense which the Act provides for actions by a tenant or occupant that are "not part of a pattern and practice,"

§ 42–3604(c)(2), would almost certainly shield the tenant from eviction in Ball's hypothetical case. In any event, courts may not rewrite statutory language merely because when pressed to an extreme application it yields a seemingly absurd result. "Laws enacted with good intention, when put to the test, frequently, and to the surprise of the lawmaker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (quoting *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 75 L.Ed. 156 (1930)); *see also 1841 Columbia Rd. Tenants Ass'n v. District of Columbia Rental Hous. Comm'n*, 575 A.2d 306, 308 (D.C.1990) (upholding agency's formula for permitting rent ceiling increases against claim that this "work[ed] an injustice in an individual case"; "[i]t is not within the judicial function ... to rewrite the statute ... to make it more 'fair' by substituting [another standard] for the statutory formula"). In the broad run of cases, the Council believed it entirely sensible, and necessary, to hold tenants accountable for the actions of those whom they have authorized to be present in the rental unit.

Finally, Ball argues that a literal reading of the definition of occupant effectively makes one or more of the defenses the Act provides "largely meaningless" (Reply Br. for App. at 3). In particular, § 42–3604(c)(1) bars eviction if "the tenant or occupant shows by a preponderance of the evidence that the events or actions" that otherwise create a drug haven "[c]ould not reasonably have been known to the tenant or occupant." Ball argues that if "occupant" includes any invitee, the landlord need only show that *that* person knew he was in possession of drugs, regardless of whether the tenant knew of the activity,

thus making the defense unavailable to a tenant such as Ball who claimed no knowledge of the drug activity. We are not persuaded. It is not obvious that, because the Council made the terms "tenant or occupant" interchangeable in regard to the landlord's burden to prove the existence of a drug haven, it meant the same result with respect to the affirmative defenses. Section 42–3604(c) conditions entry of an eviction order on the right of the tenant or occupant *"against whom the action was filed"* (emphasis added) to prove one or more of the affirmative defenses; a plausible reading of this is that the person against whom the action has been initiated—the tenant *or* occupant, as the case may be—may assert the defense, say, of lack of knowledge. We need not decide, however, whether this is the only—or even the most—reasonable interpretation of the defenses; it is enough to say that the provision for affirmative defenses does nothing to weaken our conclusion, in keeping with the plain statutory language, that a landlord can establish the existence of a drug haven through the actions of either the tenant or someone she has authorized to be in the apartment.

### III.

■ Ball argued to the trial judge, alternatively, that a drug haven as a matter of law cannot be established by proof only of a single past instance of drug activity such as took place in her apartment on January 15, 2004. The drafters of the statute, she asserted, "were concerned about apartments that were being used for ongoing drug activity[,] ... about repeated incidents, [such] that you could be in landlord tenant court and still have the drug trafficking going on." The trial judge rejected this argument; he understood the statute to mean that even a single incident of unlawful drug activity—such as oc-

curred on January 15—could meet the landlord's burden of proof "depending on the quality of the evidence of that one [incident]." Accordingly, the judge instructed the jury to consider whether "the rental unit in question here *was* a drug haven" (emphasis added), without regard to whether it continued to be one at or around the time of the trial—more than a year after the events of January 15, 2004.[3]

In *Crescent Properties, supra,* decided after the trial in this case, we rejected this reading of the RDEA as permitting eviction based solely on previous drug activity. In that case the trial judge, sitting as trier of fact, had ruled for the tenant-defendant after concluding that, although "ample evidence" established that the defendant's apartment had been a drug haven *at one time,* "the evidence did not support a finding that the apartment remained a drug haven" at the time of trial, as required by the Act. *See Crescent Properties,* 897 A.2d at 785.[4] This court sustained that ruling and interpretation of the RDEA. After considering the text, structure, and purpose of the Act, we reasoned that the statute's use of the present tense—referring to a unit that "is" a drug haven, not one that "was" a drug haven—requires a finding that the unit is an ongoing site of drug activity. *Id.* at 787. We further noted that one of the factors to be evaluat-

ed in determining the existence of a drug haven is whether the drug activity has been discontinued. *Id.* (citing D.C.Code § 42–3602(a)(6)). Altogether, we were persuaded that § 42–3602 "requires the trial court to determine whether the plaintiff has established, by a preponderance of the evidence, that a rental unit in question *is* a drug haven or that a [drug] nuisance *currently exists* there," *id.* at 788 (emphasis added); and to answer that question it "must consider not only whether the unit has been used for illegal drug activity, but also whether it is likely to be used for that purpose in the future." *Id.* at 789 (footnote omitted). Although evidence of discontinuance of the activity offered by the tenant must be "scrutinized carefully by the finder of fact," *id.* at 788–89,[5] the focus nevertheless remains on "the conditions that exist at the 'time' of the hearing," for "in order to prevail, [the landlord is] required to establish that [the] property currently remained a drug haven." *Id.* at 789.

■ Because the jury in this case was not instructed in accordance with these principles, Ball is entitled to a new trial. The judgment of possession in favor of the landlord was not final at the time *Crescent Properties* was decided (Ball having taken this appeal), and thus she is entitled to the

---

3. Elsewhere, in the same vein, the judge instructed that "[t]he plaintiff claims . . . that the defendant or the occupants . . . *were using* the premises as a drug haven"; and that the landlord's burden was to prove "that the tenant or an occupant, a person she had authorized to be there, *used* the premises as a drug haven" (emphasis added).

4. The primary drug offender in *Crescent Properties* had been the defendant-tenant's daughter, who by the time of trial had suffered a heart attack, remained hospitalized, and was unlikely to return to the apartment. *See* 897 A.2d at 790.

5. [A] recent interruption of such activity as *the result of some external force* or influence, such as a police raid, rather than a cessation brought about by the action or circumstances of the tenant, is entitled to relatively little weight in determining whether a drug haven *still* exists. If the factfinder concludes that the cessation of drug activity is a temporary reaction or 'cover,' or has been imposed from without, and that the circumstances that led to the existence of the drug haven still remain, then the factfinder may find that the rental unit remains a drug haven at the time of the hearing.
897 A.2d at 789 (footnote omitted).

benefit of that decision. *See, e.g., Davis v. Moore,* 772 A.2d 204, 226–27, 230 (D.C. 2001) (en banc). Nor are we persuaded by the landlord's argument that Ball did not object expressly to the instructions that permitted the jury to consider whether her apartment was—i.e., had been in the past—a drug haven. *See* Super. Ct. Civ. R. 51. In denying Ball's motion for judgment as a matter of law, the judge had squarely rejected the argument that the drug activity had to be ongoing, ruling instead that a single past incident could establish a drug haven "depending on the quality of the evidence." Therefore, a specific objection to the instructions repeating that argument was not necessary. *See, e.g., Thoma v. Kettler Bros., Inc.,* 632 A.2d 725, 727 n. 3 (D.C.1993) (quoting with approval 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2553, at 639–40 (1971) ("The failure to object may be disregarded if the party's position has previously been clearly made to the court and it is plain that a further objection would be unavailing.")).[6]

The judgment of possession is reversed and the case is remanded for further proceedings in accordance with this opinion.

*So ordered.*

---

6. The parties dispute the probativeness, as well as the purpose for which the trial judge admitted, rebuttal testimony by MPD Officer Boteler about more recent drug activity in or around Ball's apartment. Our decision requiring a new trial makes it unnecessary for us to resolve issues concerning that testimony.